IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

```
                                 *
UNITED STATES OF AMERICA
                                 *

          v.                     *   CRIMINAL NO.:  WDQ-12-0265

                                 *
JOSEPH OSIOMWAN
                                 *

                                 *
*   *   *   *   *   *   *   *   *   *   *   *   *
```

MEMORANDUM OPINION

Joseph Osiomwan is charged with conspiracy--and possession with intent--to distribute heroin.  On May 20, 2013, Osiomwan waived his Sixth Amendment right to a jury trial, and the Court began a bench trial.  On May 21, 2013, Osiomwan's motions (1) to suppress evidence from wiretaps, his arrest, and the search of 5404 Northwood Drive; (2) to adopt the motions of his co-defendant; (3) for disclosure of immunity, identity of informants, evidence from searches, seizures, and surveillance, and communication between government agents; (4) to preclude evidence of witnesses' plea bargains; and (5) to exclude co-conspirators' hearsay statements were denied.  His motions for extension of time to file motions, for a hearing, to file additional motions after discovery, and to adopt predecessor counsel's motions were granted.

I.   Background

A.   The Investigation and Wiretaps

In August 2011, a Drug Enforcement Administration task force began investigating Osiomwan and others for narcotics trafficking in Baltimore, Maryland.  *See* ECF No. 66-1 (SEALED) at ¶ 16.  Seven telephone lines were wiretapped; three are relevant here.  On March 14, 2012, U.S. District Judge James K. Bredar authorized interception of a telephone with a number ending in 2525.  *See* ECF Nos. 66 (SEALED) at 2, 66-1 (SEALED). On April 12, 2012, Judge Bredar authorized continuing interception of this line.  *See* ECF Nos. 66 (SEALED) at 2, 66-2 (SEALED).  On March 30, 2012, Judge Bredar authorized interception of a telephone with a number ending in 8898.  *See* ECF Nos. 66 (SEALED) at 2, 66-3 (SEALED).  On May 1, 2012, Judge John Addison Howard of the Circuit Court for Baltimore City, Maryland, authorized interception of a telephone with a number ending in 7153.  *See* ECF Nos. 66 (SEALED) at 3, 66-4 (SEALED).

The affiant was Detective Brian Shutt[1] who described the investigators' use of confidential informants, physical surveillance, toll records and pen registers, arrests, and financial investigations.  ECF Nos. 66-1 (SEALED) to 66-4 (SEALED).  Shutt also described why other investigative

---

[1] Osiomwan stipulated that Shutt is an expert in narcotics trafficking.  *See* Rough Tr. at 19.

techniques--including (1) confidential informants, (2) undercover officers, (3) physical surveillance, (4) telephone toll records and pen registers, (5) grand jury investigation, (6) search warrants, (7) arrests, (8) trash collection, and (9) financial investigation-- would not be sufficient for the investigation. *Id.*

Numerous calls were intercepted through these wiretaps. On March 15, 2012, Osiomwan called Larry Brown, who worked for Osiomwan at Woodland Motors, a car dealership owned by Osiomwan and his wife. *See* Call number 226; Rough Tr. at 121-122, 168. Brown told Osiomwan that he needed "five yellow receipts," which Osiomwan apparently did not initially understand. Call number 226. At trial, Shutt explained that this was coded language for five grams of heroin. Rough Tr. at 32. Brown and Osiomwan met at a food court for the delivery. *See* Call number 322; Rough Tr. at 33.

On May 2, 2012, Osiomwan was in Philadelphia, Pennsylvania. *See* Call Number 118; Rough Tr. at 53. From his training and experience, Shutt believed that Osiomwan was there to obtain heroin. Rough Tr. at 53. That day, Osiomwan called Brown, who reported "All no's." Call number 5776. Shutt explained that this meant that samples of heroin distributed by Brown were of poor quality. Rough Tr. at 55.

That night, Osiomwan had returned to Baltimore and was observed leaving 5404 Northwood Drive. *See* Rough Tr. at 67. As he was leaving, he called Brown and indicated that he was "going to be walking around the block." Call number 5946. On May 3, 2012, Osiomwan was called by an unknown male--to whom he had spoken about directions in Philadelphia--and discussed account numbers for payment. *See* Call numbers 118, 318, 320. From these calls, Shutt believed that Osiomwan had gone to Philadelphia to obtain additional heroin, which he transported to 5404 Northwood Drive. Rough Tr. at 68.

Meanwhile, Brown was handing out samples to his customers, including Roger Willoughby. Rough Tr. at 68-69. On May 2, 2012, Willoughby reported "seven no's and four yeahs." Call number 5943. This meant that seven "testers" to whom Willoughby had distributed heroin thought the sample quality was poor, while four had said it was good. *See* Rough Tr. at 66.

Also that day, surveillance showed Willoughby meeting Brown at Woodland Motors. *See* Rough Tr. at 45-46; call number 5717. After Willoughby left, officers followed and then stopped him. Rough Tr. at 47. A gram of heroin was recovered from him. *Id.* Shutt believed this to be a sample. *Id.* at 47-48.

B.     Osiomwan's Arrest and the Search of 5404 Northwood

       Drive

On May 3, 2012, after hearing numerous wiretapped calls,

Shutt begun to prepare search and seizure warrants for 5404

Northwood Drive and other locations known to be used by Osiomwan

and Brown.[2]  *See* Rough Tr. at 77.  To apply for the warrants,

Shutt went to U.S. Magistrate Judge Stephanie A. Gallagher's

home.  *See* Rough Tr. at 78.

While Shutt was en route to Judge Gallagher's house, a team

including Special Agent Robert Grob was watching 5404 Northwood

Drive.  *See* Rough Tr. at 78, 152.  Grob observed Osiomwan leave

the residence carrying a white plastic bag.  *Id.*  Grob watched

Osiomwan until he had walked out of Grob's sight and notified

the arrest team of Osiomwan's location.  *Id.* at 153.

Detective Derek Ostrow, part of the arrest team, was

instructed by Grob to arrest Osiomwan.  *See id.* at 183.  Ostrow

and a uniformed Baltimore City Police Officer approached

Osiomwan, and Ostrow took the plastic bag, which contained

suspected marijuana.  *Id.* at 184.  The uniformed officer

---

[2] The other locations were 539 Alter Avenue and 15934 Old York
Road.

handcuffed Osiomwan, patted him down, and found three "fingers"[3] of suspected heroin in Osiomwan's front pocket.  *Id.*

Meanwhile, Grob returned his attention to 5404 Northwood Drive.  He thought he saw a person entering the residence and believed this person could see Osiomwan's arrest.[4]  *Id.* at 153, 155.

Believing that this person had entered 5404 Northwood Drive, Grob and other officers also entered the house to prevent the destruction of evidence.  *See id.* at 154.  They quickly searched the home for occupants, and secured it while awaiting word that the warrant had been signed.  *Id.* at 155; *see* ECF No. 66-5 (SEALED) (warrant).  The affidavit in support of the warrant application contained no information about anything found in the house during the prior entry.  *See* ECF No. 66-5 (SEALED).

About 20 minutes after searching and securing the house, Grob learned from Shutt that the warrants had been signed by Judge Gallagher.  *Id.* at 160.  The officers then searched the residence and seized documents and mannite (a cutting agent for heroin).  *See id.* at 156-57.

---

[3] "Finger" is a term for finger-sized heroin packages designed to be swallowed by drug couriers.  Rough Tr. at 92.

[4] Grob--who had become disoriented while watching Osiomwan depart--later learned that the unknown person had actually entered a nearby house.  *See* Rough Tr. at 171.

C.   Procedural History

On May 4, 2012, the government filed a criminal complaint,
charging Osiomwan with conspiracy to distribute heroin in
violation of 21 U.S.C. § 846.  ECF No. 6.  On May 15, 2012, the
grand jury charged Osiomwan and Brown with (1) conspiracy to
possess and distribute one kilogram or more of heroin and (2)
possession with intent to distribute heroin.[5]  ECF No. 15.  On
May 17, 2012, Paul Kramer, Esquire, appeared for Osiomwan.

On June 19, 2012, Osiomwan moved to suppress wiretap
evidence.  ECF No. 24.  On August 24, 2012, he moved for an
extension of time to file additional motions, ECF No. 25, to
adopt the motions of his codefendant, ECF No. 26, for disclosure
of the existence and substance of promises of immunity,
leniency, or preferential treatment, ECF No. 27, for disclosure
of electronic surveillance and audio and visual recordings, ECF
No. 28, for disclosure of informants and witnesses who were
paid, ECF No. 29, for disclosure of the identity of informants
and witnesses, ECF No. 30, for disclosure of confessions and
evidence obtained through searches, seizures, and surveillance,
ECF No. 31, for a hearing, ECF No. 32, for disclosure of
government communications prior to his arrest, ECF No. 33, to
suppress evidence from his arrest, ECF No. 34, to suppress

---

[5] The indictment charged a duplicative count of possession with
intent to distribute; it was dismissed at trial on the
government's motion.

evidence from the search of 5404 Northwood Drive, ECF No. 35, to preclude evidence of cooperating witnesses' criminal records and plea bargains, ECF No. 36, and to preclude evidence of co-conspirators' statements, ECF No. 37.

On September 28, 2012, Kramer moved to withdraw as Osiomwan's counsel, ECF No. 42, and on October 1, 2012, the motion was granted, ECF No. 43.  On October 17, 2012, Brown pled guilty to the conspiracy.  ECF No. 46.  On December 3, 2012, Jack Rubin, Esquire, appeared for Osiomwan.[6]  ECF No. 50.

On January 10, 2013, Osiomwan moved for leave to file additional motions after discovery, ECF No. 56, and to adopt motions filed by Kramer, ECF No. 57.  On February 4, 2013, Osiomwan moved for review of his detention order.  ECF No. 59. On February 8, 2013, a detention hearing was held before U.S. Magistrate Judge Beth P. Gesner.  ECF No. 61.  On February 11, 2013, Brown was sentenced to 120 months imprisonment.  *See* ECF No. 63.  On May 13, 2013, the government responded to the pending motions.  ECF No. 66 (SEALED).

On May 20, 2013, Osiomwan waived a jury trial.  ECF No. 70. That day, a bench trial began.  The Court heard testimony from Shutt, Robert Grob, and Ostrow.  On May 21, 2013, the Court heard argument and ruled on the pending motions.

---

[6] In the interim, Osiomwan was briefly represented by Patrick Kent, Assistant Federal Public Defender.  *See* ECF No. 41.

## II.   Analysis

### A.   Motion to Suppress Wiretap Evidence

Osiomwan sought to suppress evidence obtained through wiretaps because the government failed to establish that wiretaps were necessary as required by 18 U.S.C. § 2518.  ECF No. 24.  The government asserted that the supporting affidavits showed sufficient necessity.  ECF No. 66 (SEALED) at 10-16.

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 governs wiretaps and requires that a judge determine that, *inter alia*, "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous"[7] "to ensure that the relatively intrusive device of wiretapping is 'not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'"[8]

The government's burden "to show the inadequacy of normal investigative techniques is not great, and the adequacy of such a showing is to be tested in a practical and commonsense fashion."  *United States v. Smith*, 31 F.3d 1294, 1297 (4th Cir. 1994).  However, "bare conclusory statements that normal techniques would be unproductive" and "mere boilerplate

---

[7] 18 U.S.C. § 2518(3)(c).

[8] *United States v. Oriakhi*, 57 F.3d 1290, 1298 (*quoting United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974)).

recitation of the difficulties of gathering usable evidence" are insufficient.[9]

A wiretap order issued by a state court must comply with Title III and the applicable state statute.  18 U.S.C. § 2516(2).  Maryland's wiretap statute contains the same necessity requirement and is read *in pari materia* with Title III.  *See* Md. Code Ann., Cts. & Jud. Proc. § 10-408(c)(1)(iii); *Davis v. State*, 43 A.3d 1044, 1051 (Md. 2012).

The government's affidavits discussed why other investigative methods--including (1) confidential informants, (2) undercover officers, (3) physical surveillance, (4) telephone toll records and pen registers, (5) grand jury investigation, (6) search warrants, (7) arrests, (8) trash collection, and (9) financial investigation--were likely to fail.  *See* ECF Nos. 66-1 (SEALED) ¶¶ 66-83, 66-2 (SEALED) ¶¶ 37-52, 66-3 (SEALED) ¶¶ 37-46, 66-4 (SEALED) ¶¶ 96-106.

The purpose of the wiretaps was to uncover additional information about the participants in the conspiracy and Osiomwan's foreign sources for the heroin.  *See, e.g.*, ECF No. 66-4 (SEALED) ¶ 96.  Although confidential sources ("CSs") were used, they did not meet or identify all the members of the conspiracy or discover Osiomwan's suppliers, which Shutt

---

[9] *Id.* (*quoting United States v. Ashley*, 876 F.2d 1069, 1072 (1st Cir. 1989); *United States v. Leavis*, 853 F.2d 215, 221 (4th Cir. 1988)).

attributed to the compartmentalized nature of the drug
conspiracy. *E.g.*, ECF No. 66-1 (SEALED) ¶ 67.  The CSs
indicated that they would be unable to introduce undercover
officers ("UCs") into the organization, and Shutt was skeptical
that UCs would be able to discover more information than the
CSs, given the compartmentalization. *E.g.*, *id.* ¶ 70; ECF No.
66-4 (SEALED) ¶ 99.

Officers had engaged in physical surveillance of Woodland
Motors through a pole camera. ECF No. 66-1 (SEALED) ¶¶ 71-72.
Although surveillance had revealed at least one heroin purchase,
surveillance was difficult because of the terrain and the
ongoing legal business--the sale of cars--at the location. *See*
*id.* ¶ 71; ECF No. 66-3 (SEALED) ¶¶ 40-41.  Because of the ease
of masking the identity of the user of a phone, toll records and
pen registers would not provide sufficient information about the
conspirators' identities. *See, e.g.*, ECF No. 66-1 (SEALED) ¶
74.

Shutt swore that without wiretaps, a grand jury investi-
gation would not be useful because many witnesses had not been
identified, and those who had were facing prosecution and were
unlikely to testify voluntarily.  ECF No. 66-4 (SEALED) ¶ 103.
Issuance of grand jury subpoenas would also alert subjects of
the wiretap to the investigation. *Id.*

Search warrants would also not be useful to identify individuals. The execution of one search warrant had provided no "additional insight into the members" of Osiomwan's organization. ECF No. 66-1 (SEALED) ¶ 79. Although search warrants could help build a case against the target, they would likely disclose the investigation and lead to operational changes within the organization. *See* ECF No. 66-3 (SEALED) ¶ 44. Similarly, trash collection would have limited value and was likely to be detected. *E.g.*, ECF No. 66-1 (SEALED) ¶ 83.

Arrests would not be sufficient. Three persons related to the conspiracy were arrested on warrants unrelated to the investigation. ECF No. 66-1 (SEALED) ¶ 80. One refused to cooperate with law enforcement, and another only knew about trafficking in Richmond, Virginia. *Id.* The third lacked sufficient knowledge of the conspiracy to provide much assistance, which Shutt attributed to use of coded language. *Id.*

An investigation into Woodland Motor's finances was also instituted to discover laundering methods. ECF No. 66-3 (SEALED) ¶ 45. This was unlikely, however, to disclose information about the trafficking itself. *Id.*

Law enforcement had used numerous investigative techniques that had not revealed the information sought about the members of the conspiracy and Osiomwan's suppliers. Because these

12

techniques were inadequate, wiretaps were necessary. *See Smith*,
31 F.3d at 1297. Accordingly, the motion to suppress was
denied.

    B.   Motion to Suppress Evidence from His Arrest

    Osiomwan sought to suppress evidence seized from him after
his arrest, asserting that his arrest was unconstitutional. ECF
No. 34. The government contended that the warrantless arrest
was lawful. ECF No. 66 (SEALED) at 18.

    "[A] warrantless arrest satisfies the Constitution so long
as the officer has 'probable cause to believe that the suspect
has committed or is committing an offense.'" *Virginia v. Moore*,
553 U.S. 164, 173 (2008) (*quoting Michigan v. DeFillippo*, 443
U.S. 31, 36 (1979)). In this context, probable cause "means
facts and circumstances within the officer's knowledge that are
sufficient to warrant a prudent person, or one of reasonable
caution, in believing" that an offense had been committed.
*DeFillippo*, 443 U.S. at 37.

    According to the complaint, Osiomwan was arrested for
conspiracy to distribute heroin in violation of 21 U.S.C. § 846.
ECF No. 6. There was ample evidence available to law
enforcement to establish probable cause for his arrest.

    Shutt, who was aware of the surveillance of Osiomwan,
directed task force members to arrest Osiomwan. Rough Tr. at
79. The coded language in the wiretapped calls indicated that

Osiomwan was conspiring with Brown to distribute heroin. *See,*
*e.g.,* call number 226; Rough Tr. at 31-32. These facts are
sufficient for a reasonable person to believe the offense had
been committed.[10] *See DeFillippo*, 443 U.S. at 37. Because the
officers had probable cause to arrest, the search incident to
Osiomwan's arrest did not offend the Fourth Amendment. *See*
*Moore*, 553 U.S. at 173. The motion was denied.

    C.    Motion to Suppress Evidence from the Search of 5404

        Northwood Drive

Osiomwan moved to suppress evidence seized from 5404
Northwood Drive because law enforcement entered the residence
before the search warrant was secured. ECF No. 35. The
government asserted that entry to prevent destruction of
evidence and to perform a "protective sweep" was permitted, and
the seized evidence would inevitably have been discovered during
execution of the search warrant. ECF No. 66 (SEALED) at 19-23.

A warrantless search of a home is presumptively unreason-
able. *Payton v. New York*, 445 U.S. 573, 586 (1980). However,
officers may enter a home in exigent circumstances, including to

---

[10] The elements of the conspiracy charge are:
    (1) an agreement between two or more persons to engage in
    conduct that violates a federal drug law--here, to
    distribute or possess narcotics with intent to distribute;
    (2) the defendant's knowledge of the conspiracy; and (3)
    the defendant's knowing and voluntary participation in the
    conspiracy.
*United States v. Hickman*, 626 F.3d 756, 763 (4th Cir. 2010)
(internal quotation marks omitted).

prevent the destruction of evidence.  *See Kentucky v. King*, 131

S. Ct. 1849, 1857 (2011).  The Fourth Circuit uses several

factors to determine whether exigent circumstances exist,

including:

> (1) the degree of urgency involved and the amount of time
> necessary to obtain a warrant; (2) the officers' reasonable
> belief that the contraband is about to be removed or
> destroyed; (3) the possibility of danger to police guarding
> the site; (4) information indicating the possessors of the
> contraband are aware that the police are on their trail;
> and (5) the ready destructibility of the contraband

*United States v. Turner*, 650 F.2d 526, 528 (4th Cir. 1981); *see*

*United States v. Moses*, 540 F.3d 263, 270 (4th cir. 2008).

Here, the claim of exigent circumstances is predicated on

Grob's testimony that he thought he saw someone enter 5404

Northwood Drive, although he later discovered that the

individual had entered an adjacent residence.  *See* Rough Tr. at

153, 171.  Grob believed that this person could have seen

Osiomwan arrested before he entered the building.  Rough Tr. at

153.

Although Shutt was obtaining the search warrant, the

unknown person's believed entry into the house greatly increased

the apparent urgency of the situation: Grob believed that

someone who likely had seen Osiomwan's arrest had entered this

house.  *See* Rough Tr. at 153.  This raised a reasonable concern

that evidence inside the house would be destroyed.  *See United*

*States v. Carter*, 566 F.2d 1265, 1269 (5th Cir. 1978) ("[H]eroin

is a readily disposable item."). Accordingly, the officers acted reasonably in entering 5404 Northwood to safeguard the evidence.

The government next asserts that because officers were lawfully in the residence under exigent circumstances, "they were entitled to conduct a 'protective sweep.'"  ECF No. 66 (SEALED) at 22.  The government relies only on *Maryland v. Buie*, 494 U.S. 325 (1990), in which the Supreme Court held that incident to an arrest and based upon reasonable suspicion, officers may make a "cursory inspection of those spaces where a person may be found" as a protective sweep.  *Id.* at 334-35.

Although signaling its receptiveness to the proposition, the Fourth Circuit has not addressed in a binding opinion whether a protective sweep under *Buie* may be predicated on lawful presence other than incident to arrest.  *See United States v. Portis*, 407 F. App'x 669, 672 (4th Cir. 2011) (per curiam) (protective sweep before consent given).  Several courts of appeal have held that a protective sweep may be conducted after other legal entry into a home, including for exigent circumstances.[11]

---

[11] *See, e.g., United States v. Spotted Elk*, 548 F.3d 641, 651 (8th Cir. 2008) ("When police have lawfully entered the house in response to exigent circumstances, they may conduct a protective sweep . . . ."); *United States v. Martins*, 413 F.3d 139, 150 (1st Cir. 2005) (holding "that police who have lawfully entered a residence possess the same right to conduct a protective

These courts have generally reasoned that a lawful warrantless entry into a home creates a risk of harm similar to the risk accompanying an arrest.  *See, e.g.*, *Gould*, 364 F.3d at 584.  Accordingly, they saw no reason to limit *Buie* to arrests. The Court finds this reasoning persuasive and believes that the Fourth Circuit would follow those courts of appeal expanding *Buie* to cases other than in-home arrests.  *See Portis*, 407 F. App'x at 672.  Accordingly, the protective sweep, if supported by reasonable suspicion, did not violate the Fourth Amendment.

As discussed above, Grob believed that a person who could have witnessed Osiomwan's arrest had entered 5404 Northwood. *See* Rough Tr. at 153.  Accordingly, he reasonably believed that a protective sweep of the house was necessary to find the individual to protect the officers and evidence.  Further indicating reasonableness, the police did not conduct any search

---

sweeping whether an arrest warrant, a search warrant, or existence of exigent circumstances prompts their entry"); *United States v. Caraballo*, 595 F.3d 1214, 1224-25 (11th Cir. 2010) (upholding protective sweep after lawful presence other than for arrest); *United States v. Miller*, 430 F.3d 93, 99-100 (2d Cir. 2005) (permitting protective sweeps in circumstances other than execution of arrest warrant); *United States v. Gould*, 364 F.3d 578, 586 (5th Cir. 2004) (en banc) ("[A]n in-home protective sweep is not necessarily or *per se* invalid. . . merely because it is not incident to arrest . . . ."), *abrogated on other grounds by Kentucky v. King*, 131 S. Ct. 1849 (2011); *see also United States v. Baker*, 577 F.2d 1147, 1152 (4th Cir. 1978) (pre-*Buie* decision upholding protective sweep of home for potential accomplice when defendant was arrested out front). *But see, United States v. Torres-Castro*, 470 F.3d 992, 997 (10th Cir. 2006) (holding "that a protective sweep is only valid when performed incident to an arrest").

other than the sweep before obtaining the warrant, and no evidence was recovered before the warrant was signed. *See* Rough Tr. at 163-64, 178. The police entry into the home was reasonable under the exigent circumstances and protective sweep warrant exceptions. *See King*, 131 S. Ct. at 1857; *Buie*, 494 U.S. at 334-35. There was no Fourth Amendment violation.

Additionally, the government asserts that even if they improperly entered the home anything discovered would be admissible under the inevitable discovery doctrine. ECF No. 66 (SEALED) at 22. "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . the evidence should be received." *Nix v. Williams*, 467 U.S. 431, 444 (1984).

The affidavit relied upon by Judge Gallagher in issuing the search warrant did not mention Osiomwan's arrest and the search of the house. *See* ECF 66-5 (SEALED). Because the initial search and execution of the warrant occurred in short succession, there was no time for the entry and sweep to taint the warrant process.[12]

---

[12] *Cf. United States v. Karo*, 468 U.S. 705, 719 (1984)("[I]f sufficient untainted evidence was presented in the warrant affidavit to establish probable cause, the warrant was nevertheless valid"). Osiomwan has not challenged the probable cause underlying the warrant. *Cf.* ECF No. 35.

No evidence was seized from the house until the warrant had been issued. Rough Tr. at 178. Even if the officers had not searched after arresting Osiomwan, they certainly would have done so a short time later with warrant in hand. Accordingly, the government has established that the evidence would have been discovered by the lawful means of the warrant, regardless of the legality of the exigent circumstance entry and protective sweep. Accordingly, the motion to suppress was denied.

D.   Disclosure Motions

Osiomwan filed several discovery motions to compel the disclosure of: (1) existence and substance of promise of immunity, leniency, or preferential treatment for any prosecution witness, ECF No. 27, (2) electronic surveillance and audio and visual tape recordings, ECF No. 28, (3) informants and witnesses who were paid, ECF No. 29, (4) the identity of confidential informants, ECF No. 30, (5) the government's intent to use evidence obtained by confession, admission, searches, seizures, or surveillance, ECF No. 31, and (6) all communications prior to the execution of the search warrant at 5404 Northwood Drive and arrest of Osiomwan, ECF No. 36.

The government asserted that it had met its discovery obligations under Fed. R. Crim. P. 16, *Brady v. Maryland*,[13]

---

[13] 373 U.S. 83 (1963).

*Giglio v. United States*,[14] and the Jencks Act.[15]  At trial, Rubin
indicated multiple times that he had received all discovery.
*See, e.g.*, Rough Tr. at 112.  Additionally, the government did
not call any cooperating witnesses.  Accordingly, these motions
were denied as moot.

    E.   Motions in Limine about Witnesses

    Osiomwan moved to preclude testimony about cooperating
witnesses' plea bargains.  ECF No. 36.  The government did not
call any cooperating witnesses.  The motion was denied as moot.

    Osiomwan also sought to exclude statements made by co-
conspirators until a conspiracy was established and unless the
statements were made during the course of and in furtherance of
the conspiracy.  ECF No. 37.  Hearsay is an out of court
statement offered for the truth of the matter asserted, and is
generally barred by the Rules of Evidence.  *See* Fed. R. Evid.
801(c), 802.  Co-conspirator statements during and in
furtherance of the conspiracy are excluded from the definition
of hearsay.  Fed. R. Evid. 801(d)(2)(E).

    The government called no cooperating witnesses, and to that
extent the motion is moot.  To the extent that Osiomwan
challenges the wiretapped conversations themselves, the
statements are not barred by the hearsay rule.  The majority of

---

[14] 405 U.S. 150 (1972).

[15] 18 U.S.C. § 3500.

the statements in the wiretapped conversations are coded.  The
government does not seek admission of those statements for the
truth of what was said.  The words are nearly meaningless
without interpretation.  To this extent, the statements have no
evidentiary value for the truth of what was asserted and are not
hearsay.  *Cf.* Fed. R. Evid. 801(c), 802.

To the extent the motion challenges the co-conspirator
statements as interpreted by Shutt, the government must prove
the conspiracy's existence by a preponderance of the evidence.
*See Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987);
Fed. R. Evid. 104(a).  Although independent evidence is
required, it may be supplemented by the hearsay statements.  *See
Bourjaily*, 483 U.S. at 181; *Campbell v. Lyon*, 26 F. App'x 183,
189 (4th Cir. 2001) (per curiam).

The government has proven the conspiracy by a preponderance
of the evidence.  Heroin was found on Osiomwan's person when he
was arrested.  *See* Rough Tr. at 185.  Osiomwan used coded
language with Brown and others to describe the drugs and
transactions. *See, e.g.*, Rough Tr. at 31-32, 73.  Police
surveillance indicated drug activity originating at Woodland
Motors, owned by Osiomwan.  *See* Rough Tr. at 45-48.  This
evidence establishes the conspiracy.  The motion to preclude was
denied--in part as moot.

F.   Additional Motions

On September 10, 2012, Osiomwan moved for additional time to file pretrial motions.  ECF No. 26.  The government did not oppose this motion.  ECF No. 66 (SEALED) at 2.  Accordingly, it was granted.

Osiomwan sought to adopt motions of his codefendant.  ECF No. 26.  Brown has been sentenced and never filed substantive motions.  *See* ECF Nos. 60, 63.  Accordingly, the motion was denied as moot.

Osiomwan also sought a hearing on the outstanding motions. ECF No. 32.  The hearing was contained within the bench trial, and the motion was granted.

After Kramer withdrew, Osiomwan, through Rubin, moved to adopt the motions filed by Kramer and for leave to file additional motions after discovery.  ECF Nos. 56, 57.  These motions were granted.

On February 4, 2013, Osiomwan moved for review of the detention order.  ECF No. 59.  On February 8, 2013, a detention hearing was held before U.S. Magistrate Judge Beth P. Gesner. ECF Nos. 61, 62.  The motion was denied as moot.

III. Conclusion

For the reasons stated above, Osiomwan's motions to suppress evidence from wiretaps, his arrest, and the search of 5404 Northwood Drive were denied.  His motions to adopt the

motions of his co-defendant; for disclosure of immunity,
identity of informants, evidence from searches, seizures, and
surveillance, and communication between government agents; and
to preclude evidence of witnesses' plea bargains were denied as
moot.  The motion to exclude co-conspirators' hearsay statements
was denied--in part as moot.  His motions for extension of time
to file motions, for a hearing, to file additional motions after
discovery, and to adopt predecessor counsel's motions were
granted.


_____5/22/13_____
Date

_____
William D. Quarles, Jr.
United States District Judge

23